789 F.2d 1396
 UNITED STATES of America, Plaintiff-Appellant,
v.
33.5 ACRES OF LAND, MORE OR LESS, in the COUNTY OF OKANOGAN,
STATE OF WASHINGTON, Defendant,
and
David S. Smith and Janet G. Smith, husband and wife, et al.,
Defendants-Appellees.
UNITED STATES of America, Plaintiff-Appellant,
v.
25.7 ACRES OF LAND, MORE OR LESS, in the COUNTY OF OKANOGAN,
STATE OF WASHINGTON, Defendant,
and
David S. Smith and Janet G. Smith, husband and wife, et al.,
Defendants-Appellees.
 No. 85-3631.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 9, 1986.
Decided May 19, 1986.
 
 Robert M. Sweeney, Asst. U.S. Atty., Spokane, Wash., Robert L. Klarquist, Jacques B. Gelin, Dept. of Justice, Appellate Section, Land & Natural Resources Div., Washington, D.C., for plaintiff-appellant.
 Richard B. Price, Omark, Wash., for defendants-appellees.
 Appeal from the United States District Court for the Eastern District of Washington.
 Before GOODWIN, HALL and THOMPSON, Circuit Judges.
 GOODWIN, Circuit Judge.
 
 
 1
 The United States appeals the judgment following a jury trial in which David and Janet Smith were awarded severance damages arising from the condemnation of a parcel of the Smiths' ranch.
 
 
 2
 In 1981 the United States, on behalf of the Bonneville Power Administration ("BPA"), initiated condemnation proceedings to acquire a power line easement across the Smiths' ranch in eastern Washington. The court granted possession on August 15, 1981. BPA then installed the 230-kilovolt transmission line facilities. About fifty-nine acres were taken, most of which were grazing lands. The ranch consists of about 6,200 acres.
 
 
 3
 When the condemnation action came to trial, the government sought in a motion in limine to exclude evidence of the infestation of diffuse knapweed, a persistent and noxious weed which has invaded large areas of western rangeland, including, since 1981, the Smiths' ranch. The trial court denied the motion so that the Smiths could show whether the BPA's proposed use of the condemned land would have affected the market for the rest of their rangeland in August 1981 because of potential knapweed damage.
 
 
 4
 At trial, the landowners offered testimony from several knapweed experts on how knapweed is introduced in an area, how it spreads, what was known about its control in 1981, its effect on rangeland productivity, and the effect that it would have had on any bargained price of the property in 1981 had there been a negotiated sale in the local market.
 
 
 5
 The government's appraiser estimated just compensation to be $15,800. The Smiths' appraiser testified that the landowner's compensation should be $223,225. About $141,500 of this amount was based on his estimate that the weed problem lowered the value of 5,659 acres of rangeland by $25 per acre.
 
 
 6
 The jury awarded the landowner $187,000.
 
 
 7
 When the government takes only part of a person's property, and when the value of the remainder depreciates because of the proposed use on the condemned parcel, the owner is entitled to compensation both for that which is physically appropriated and for the diminution in value to the non-condemned property. United States v. Dickinson, 331 U.S. 745, 750-51, 67 S.Ct. 1382, 1385-86, 91 L.Ed. 1789 (1947); United States v. Miller, 317 U.S. 369, 376, 63 S.Ct. 276, 281, 87 L.Ed. 336 (1943). This latter amount "is often, though somewhat loosely, spoken of as severance damage." Miller, 317 U.S. at 376, 63 S.Ct. at 281.
 
 
 8
 "Severance damages are compensable only if the landowner incurs a direct loss reflected in the marketplace that results from the taking.... [T]he landowner must demonstrate that the taking caused the severance damages." United States v. 760.807 Acres of Land, 731 F.2d 1443, 1448 (9th Cir.1984) (citations omitted). Any loss in value to the remainder is thus measured as of the filing of the declaration of taking. United States v. 50 Acres of Land, 469 U.S. 24, 105 S.Ct. 451, 453 n. 3, 83 L.Ed.2d 376 (1984).
 
 
 9
 Anticipated damage which may or may not be incurred is recoverable as severance damages if fear of that damage "would affect the price a knowledgeable and prudent buyer would pay to a similarly well-informed seller ...." 760.807 Acres of Land, 731 F.2d at 1447.
 
 
 10
 The government here argues that the knapweed evidence the Smiths offered does not support a severance damage claim, but rather a contract claim under the Tucker Act, 28 U.S.C. Sec. 1491 (1982), or a tort claim under the Federal Tort Claims Act, 28 U.S.C. Sec. 1346(b) (1982), and thus the weed damage claim cannot be heard in this condemnation proceeding. Its theory is that the knapweed evidence was irrelevant to proving severance damages because any losses to the Smiths' ranch due to the knapweed occurred only after the taking occurred, when the weed actually invaded the land.
 
 
 11
 The government's contention is inconsistent with the theory on which the case was tried. The Smiths sought money not as damages for the actual invasion of knapweed, but for the threatened invasion of knapweed that reduced the value of their land.
 
 
 12
 First, the extensive knapweed testimony adduced at trial indicates that the ranch's value was adversely affected by the taking itself. Several experts testified about the perceived effect of knapweed on the value of ranch land. That testimony indicated that road construction and traffic, which the government acknowledged would accompany its construction activities, are primarily responsible for introducing knapweed to a pristine area. Dr. Ben Roche, professor of range management at Washington State University, testified that road traffic is "the most significant factor" in introducing the weed; the government's appraiser called the roads built when large ranches are subdivided "the breeders of knapweed." Dr. Elvin Kulp, an area agronomist for Grant County through Washington State University's Cooperative Extension program, explained that the weed is spread by animals, wind, and man, "especially vehicles." Others explained that knapweed is impossible to eradicate and can be contained only through use of an expensive and toxic herbicide. The weed crowds out those plants which livestock eat and becomes dominant if not treated. Accordingly, rangeland free of knapweed and of those conditions likely to promote its introduction is more valuable than infested land. This testimony indicates that the apprehension of knapweed infestation on the part of a knowledgeable buyer of eastern Washington rangeland in 1981 would not have been "based wholly on speculation and conjecture," 760.807 Acres, 731 F.2d at 1447, but on substantial data then available on conditions favoring introduction of the weed and on the lack of adequate controls.
 
 
 13
 The testimony was correctly limited to the consideration of the effect on the value of the land from the prospective invasion. This is not a case in which the party whose land was condemned is seeking recovery for a physical invasion of the remainder after the filing of the declaration of taking. See United States v. 101.88 Acres of Land, 616 F.2d 762, 767-72 (5th Cir.1980) (damages from dumping of spoil on remainder not compensable as severance damage); United States v. 3,317.39 Acres of Land, 443 F.2d 104, 106 (8th Cir.1971) (damage from flooding beyond that described in declaration of taking not compensable as severance damage). The Smiths' appraiser, in estimating the weed's effect on the ranch's value, explicitly limited his assessment to the time of the taking and to the response of a knowledgeable buyer on learning of the condemnation and the proposed uses of the land.[1]
 
 
 14
 Finally, the jury instructions, not even challenged here, support the Smiths' position that their claim is properly recoverable as severance damages. The court instructed the jury that it was
 
 
 15
 only to consider [knapweed evidence] to the extent, if any, that the possibility or probability of weed infestation and measures required to control it, would have been considered by an informed buyer and seller in negotiating for the purchase of the property in 1981, each knowing that the transmission line was to be construed on the land.
 
 
 16
 The district court did not abuse its discretion in admitting knapweed evidence. "All facts which would influence a person of ordinary prudence, desiring to purchase the property, are admissible.... The modern trend favors a broad rule of admissibility, with discretion in the trial court." United States v. 100 Acres of Land, 468 F.2d 1261, 1267 (9th Cir.1972) (citations omitted), cert. denied, 414 U.S. 822, 94 S.Ct. 119, 38 L.Ed.2d 54 (1973).
 
 
 17
 We also hold that the district court did not err in applying federal law to determine the appropriate level of compensation. See Miller, 317 U.S. at 379-80, 63 S.Ct. at 282-83 (United States Constitution supplies the measure of compensation in condemnation proceedings brought by the federal government). None of the statutes under which the United States proceeded suggests that we should look to Washington law to assess just compensation. Georgia Power Co. v. Sanders, 617 F.2d 1112, 1118-19 (5th Cir.1980) (en banc, which held state law provides measure of compensation in condemnation proceedings brought under Sec. 21 of the Federal Power Act, 16 U.S.C. Sec. 814 (1982)), cert. denied, 450 U.S. 936, 101 S.Ct. 1403, 67 L.Ed.2d 372 (1981), is distinguishable. The condemnation in that case was brought by a federal licensee, and the court concluded that under those circumstances the federal interest was insufficient to construe the statute as displacing state law.
 
 
 18
 Finally, we reject the government's claim that the jury's award is supported by insufficient evidence. "It is thoroughly established that the sufficiency of the evidence is not reviewable on appeal unless a motion for a directed verdict was made in the trial court." Trans World Airlines, Inc. v. Shirley, 295 F.2d 678, 678-79 (9th Cir.1961); C. Wright & A. Miller, 9 Federal Practice and Procedure Sec. 2536 at 593 (1971). The government raises the insufficiency argument for the first time before this court; because that claim was not raised earlier, it has been waived.
 
 
 19
 There is a limited exception to the rule against review of the sufficiency of the evidence in the absence of a motion for a directed verdict: where there is "plain error apparent on the face of the record that, if not noticed, would result in a manifest miscarriage of justice." Id. at 594. See also United States v. Harrell, 133 F.2d 504, 507 (8th Cir.1943) (eminent domain).
 
 
 20
 Even under this limited exception, the government's position is without merit. The government suggests that the Smiths' appraiser's estimate is invalid because it was arrived at without reference to objective market data. But landowners may meet their burden of establishing land value in several ways. The preferred means of determining that value is by referring to sales of comparable property. 100 Acres of Land, 468 F.2d at 1265. But if there are no comparable sales or too few to provide a reliable basis for comparison, then other methods may be used to measure just compensation. Id.
 
 
 21
 Expert opinion testimony is admissible, so long as the expert is "qualified to appraise the value of the subject property, and [has] a factual basis for forming an opinion." United States v. 429.59 Acres of Land, 612 F.2d 459, 462 (9th Cir.1980). Thus, "objective market data" is not required in every case. "In situations where there are few instances of comparable sales in recent times, the expert is only expected to make a reasonable estimate of the market value of the subject property after examining all the relevant facts." Id.
 
 
 22
 Although the Smiths' witness did not state whether there were comparable sales to which he could refer in reaching his conclusions, the government's appraiser admitted, after testifying at length about other sales in the region, that there were no comparable sales. The transcript shows that the expert's opinion was supported by his reasoned evaluation of the risk of weed damage at the time of the condemnation, the effect on rangeland productivity of knapweed infestation, and the state of knowledge in 1981 of knapweed control. The jury's award, amounting to about $36,000 less than Wilson's estimated damage, hardly constitutes the "plain error" or wreaks the "manifest injustice" required to upset that verdict on review.
 
 
 23
 The judgment is AFFIRMED.
 
 
 
 [1]
 Wilson testified:
 A: ... an informed buyer, ..., immediately after he became aware of this easement, would have said because of the restrictions in the easement, ... and because of the liabilities that I have incurred because of this easement, I, Mr. Smith, I think that your land has been reduced by $25 per acre. I think that is a very nominal reduction.
 Q: And now, Mr. Wilson, what liabilities would that buyer be considering on August 7, 1981, that would reflect $141,000 reduction in value of the grazing lands?
 A: Mr. Sweeney, a prudent and informed buyer, as I described to the jury before, would be aware that during this construction period that the Bonneville took the easement for, and ... that the land would be disturbed, the vehicles would be back and forth, and that that land would be infected with weeds.
 ....
 Q: Now, would a buyer, now, as of August 7, 1981, say to himself, well, these weeds are going to spread over the entire ranch, is that what you're saying?
 A: I'm saying that he would say there is a good possibility, unless some control is found, that these weeds will eventually spread over this entire ranch.
 Q: And there was no control available in 1981?
 A: There was no definite control in 1981.